**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSHUA WHITE, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:17–cv–01310 (JCH) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, Acting | : | JUNE 11, 2018 |
| Commissioner, Social Security | : | |
| Administration, | : | |
| Defendant. | : | |

**RULING RE: MOTION TO REVERSE THE DECISION OF THE COMMISSIONER
(DOC. NO. 17) & MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(DOC. NO. 18)**

## I.    INTRODUCTION

Plaintiff Joshua White ("White") brings this appeal under section 405(g) of title 42 of the United States Code from the final decision of the Commissioner of the Social Security Administration ("SSA"), which denied his application for Title II disability insurance benefits and Title XVI supplemental security income.  See Complaint ("Compl.") (Doc. No. 1).  White seeks either reversal or remand of the Decision rendered by Administrative Law Judge ("ALJ") Louis Bonsangue, which affirmed the Commissioner's denial.[1]  See Mot. to Reverse the Decision of the Comm'r ("Mot. to Reverse") (Doc. No. 17).  The Commissioner cross-moves for an order affirming that Decision.  See Mot. to Affirm the Decision of the Comm'r ("Mot. to Affirm") (Doc. No. 18).

---

[1] White only appeals the denial of Supplemental Security Income ("SSI"), not the denial of Disability Insurance Benefits ("DIB").  See Mem. in Support of Mot. to Reverse ("Pl's Mem.") (Doc. No. 17-1) at 1 n.1.

For the reasons set forth below, the Motion to Reverse the Decision of the Commissioner is **GRANTED**.  The Motion to Affirm the Decision of the Commissioner is **DENIED**.

## II.    PROCEDURAL HISTORY

White applied for disability and supplemental security income benefits on March 31, 2015, alleging a disability onset date of January 1, 2007.  See R. at 20.  The Commissioner denied White's application initially on June 11, 2015, and upon reconsideration on November 10, 2015.  See id.  White requested a hearing with an ALJ, which was held before ALJ Bonsangue on July 25, 2016.  See id.

On November 2, 2016, ALJ Bonsangue issued an unfavorable decision for White, affirming the Commissioner's denial and finding that White was not disabled. See id. at 36.  Specifically, ALJ Bonsangue found that White's impairments did not meet or equal any listing, see id. at 23, and that, with his level of residual functional capacity ("RFC"), there were jobs in the national economy that he could perform, see id. at 35– 36.  White requested review by the Appeals Council, which denied the request on July 18, 2017.  See Compl. at 1.  Following that denial, ALJ Bonsangue's November 2, 2016 Decision became a final decision reviewable by this court.  See id., Notice of Appeals Council Action, at 2.  White then filed this appeal on August 3, 2017.  See Compl.

## III.   FACTS

The court adopts the facts as stated in the parties' joint Stipulation of Medical Facts ("Stipulation") (Doc. No. 17-2), and it will therefore only briefly describe the facts relevant to this opinion.

White was 31 at the time of his hearing in November 2016.  See R. at 400.  The Record in this case begins in December 2009, when White was voluntarily admitted to

the Institute of Living for suicidal ideation.  <u>See</u> Stipulation at 1.  In April 2010, White

was admitted for inpatient treatment at St. Francis Hospital and, in June 2010, White

was admitted to the Institute of Living.  <u>See</u> <u>id.</u> at 2–3.  Both treatments were for mood

and medication stabilization and substance abuse issues.  <u>See</u> <u>id.</u>

      White was incarcerated from July 19, 2010, to May 15, 2014.  <u>See</u> <u>id.</u> at 5.  From

March 2015, until the Record ends in August 2016, Dr. Kent Sunderland treated White

at Community Health Center ("CHC").  <u>See</u> <u>id.</u> at 7, 15.  In addition to two treating

source opinions from Dr. Sunderland, the Record contains psychiatric evaluations from

consultative physicians who examined White, including Dr. Craig Burns, Dr. April

McLean, and Dr. Jaimie Burns.  <u>See</u> <u>id.</u> at 3–13.  Two state agency psychologists, Dr.

Michelle Leveille and Dr. Susan Uber, reviewed the record and prepared opinions

regarding White's emotional impairments.  <u>See</u> <u>id.</u> at 11–13.  Finally, state agency

medical consultant Dr. Angelina Jacobs prepared an opinion on White's physical

condition based on her review of the Record.  <u>See</u> <u>id.</u> at 14.[2]

      In the time since White applied for disability benefits in March 2015, he has been

diagnosed with depression, bipolar disorder, anxiety, and antisocial personality disorder.

<u>See</u> <u>id.</u> at 7–10, 15.  Prior to March 2015, White had also been diagnosed with

antisocial personality disorder, schizoaffective disorder, alcohol and cocaine

dependence, PCP abuse, and intermittent explosive disorder.  <u>See</u> <u>id.</u> at 3–4.

---

[2] White does not challenge the ALJ's finding that he does not have any severe physical impairments and could perform work at all exertional levels.  <u>See</u> R. at 23, 24–25.

IV.    STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review de novo the ALJ's decision as to whether the claimant was disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court may only set aside an ALJ's determination as to social security disability if the decision "is based upon legal error or is not supported by substantial evidence."  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence requires "more than a mere scintilla," but is a "very deferential standard of review."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447–48 (2d Cir. 2012).  It requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 448.  If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive, and the court will not substitute its judgment for the Commissioner's.  42 U.S.C. § 405(g) (2016); see also Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

V.    DISCUSSION

White argues that ALJ Bonsangue's decision should be reversed or remanded for five reasons.  First, he argues that the ALJ failed to properly apply the treating physician rule to the April 2015 or September 2015 opinions of White's treating physician, Dr. Kent Sunderland.  See Mem. in Supp. of Mot. to Reverse ("Pl.'s Mem.") (Doc. No. 17-1) at 11–15.  Second, White argues that the ALJ "cherry-picked" the opinions of the consultative examiners who examined White.  See id. at 6–10.  Third, he argues that the ALJ's Decision was not supported by substantial evidence because the ALJ improperly substituted his own opinion and those of the non-examining consultative examiners for the examining medical opinions.  See id. at 3–6, 15–17.  Fourth, White argues that the ALJ erred by crediting or discrediting medical opinions on the basis of

4

Global Assessment of Functioning ("GAF") scores.  See id. at 17–20.  Fifth, he argues

that the ALJ's RFC was not supported by substantial evidence and failed to include all

of White's limitations.[3]  See id. at 20–24.

A.    Treating Physician Rule

SSA regulations give the opinions of treating physicians "controlling weight," so

long as those opinions are "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and [are] not inconsistent with the other substantial

evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2);[4] see also Lesterhuis v. Colvin,

805 F.3d 83, 88 (2d Cir. 2015).  In other words, "the SSA recognizes a 'treating

physician' rule of deference to the views of the physician who has engaged in the

primary treatment of the claimant."  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)

(quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).  "Even if the

treating physician's opinion is contradicted by other substantial evidence, and so is not

controlling, it may still be entitled to significant weight 'because the treating source is

inherently more familiar with a claimant's medical condition than are other sources.'"

Tankisi v. Comm'r of Social Sec., 521 F. App'x 29, 33 (2d Cir. 2013) (Summary Order)

(quoting Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988)).  A treating physician

opinion is especially valuable "with respect to mental health issues because the inherent

subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to

---

[3] Because the court finds that the RFC is not supported by substantial evidence, it does not separately address White's arguments about the inaccuracy of the hypotheticals posed to the Vocational Expert ("VE") at Step 5 based on that RFC.

[4] The Regulation has been amended, but the amended version does not apply to this case, which was filed before the new medical evidence rules became effective on March 27, 2017.  See 82 Fed. Reg. 5,844 (Jan. 18, 2017), 2017 WL 168819.

personally observe the claimant." <u>Carton v. Colvin</u>, No. 3:13–CV–379 (CSH), 2014 WL 108597, at *15 (D. Conn. Jan. 9, 2014) (citing <u>Bethea v. Astrue</u>, 3:10–CV–744 (JCH), 2011 WL 977062, at *11 (D. Conn. Mar. 17, 2011)).

The ALJ declined to give controlling weight to either of Dr. Kent Sunderland's medical source statements. <u>See</u> R. at 32–33. White argues that the ALJ erred by failing to provide a sufficient explanation for why he accorded "little weight" to the opinions of the treating psychologist. <u>See</u> Pl.'s Mem. at 11–15. The Commissioner argues that the ALJ properly applied the treating physician rule when he recognized that Dr. Sunderland's treatment notes were inconsistent with his opinions. <u>See</u> Def.'s Mem. at 13.

In his April 2015 opinion, Dr. Sunderland rated White's ability to use appropriate coping skills and handle frustration appropriately as "Frequently a problem, or Limited ability." R. at 593.[5] In the space provided for elaborating on the assigned ratings, Dr. Sunderland wrote, "low frustration tolerance, states historically he was violent/had a short temper. Now either washes out or internalizes and isolates." <u>Id.</u> Dr. Sunderland rated White's ability to interact appropriately with others, his ability to ask questions or request assistance, and his ability to get along with others without distracting them or exhibiting behavioral extremes as "Frequently a problem, or Limited ability." R. at 594. He rated White's ability to respect or respond appropriately to others in authority as "Always a problem, or No ability." Dr. Sunderland explained, "problems with authority, being told what to do causes anger and verbal, sometimes physical outbursts." <u>Id.</u>

---

[5] Although Dr. Sunderland prepared the April 2015 medical source statement, <u>see</u> R. at 595, the ALJ attributed it to Dr. Kimberly Citron, <u>see</u> R. at 32. Dr. Citron co-signed the document as Dr. Sunderland's supervisor. <u>See id.</u>

Dr. Sunderland then rated White's ability to carry out single-step instructions as "Sometimes a problem, or Reduced ability" and his ability to focus long enough to finish simple activities or tasks as "Always a problem, or No ability."  Id.  He rated White's ability to carry out multi-step instructions, his ability to change from one simple task to another, his ability to perform basic activities at a reasonable pace, and his ability to persist in simple activities without interruption from psychological symptoms as "Frequently a problem, or Limited ability."  Dr. Sunderland explained, "very limited attention span, limited memory, relies heavily on others for appointment reminders and requires frequent repetition of instructions."  Id.  Finally, Dr. Sunderland indicated that White would not be capable of handling his own funds "given reported memory problems and impulsivity, a rep payee should be considered."  R. at 595.

In his September 2015 opinion, which came after two additional appointments with White, Dr. Sunderland rated White's ability to use appropriate coping skills and handle frustration appropriately as "Always a problem or No ability."  R. at 603.  Dr. Sunderland generally applied the same ratings for social interactions as he had selected in his April 2015 opinion, but changed White's ability to ask questions or request assistance from "Frequently a problem, or Limited ability" to "Sometimes a problem, or Reduced ability."  R. at 604.

The September 2015 opinion also reflected improvements in White's task performance ratings.  Dr. Sunderland rated White's ability to carry out single-step instructions and his ability to carry out multi-step instructions as "Average ability/functioning in this area."  Id.  He rated White's ability to perform basic activities at a reasonable pace as "Sometimes a problem, or Reduced ability."  However, Dr.

Sunderland opined that White's ability to focus long enough to finish simple activities or tasks, his ability to change from one simple task to another, and his ability to persist in simple activities without interruption from psychological symptoms were "Frequently a problem, or Limited ability." Id. Dr. Sunderland then indicated that there was no reason why White would not be capable of handling his own funds. See R. at 605.

The ALJ stated that Dr. Sunderland's opinions were given "little weight" because they were "generally inconsistent" with the medical evidence of record and the treatment notes. R. at 32. After stating that each of Dr. Sunderland's opinions was inconsistent with the Record, the ALJ inserted a summary he had prepared of the medical evidence. See id. However, the summary was an incomplete account of the Record and was in fact consistent with both of the treating source opinions. See id. The court concludes that, by failing to point to evidence that contradicted any of Dr. Sunderland's findings or provide an explanation of why Dr. Sunderland's findings were unsubstantiated, the ALJ has not supported his decision to decline to give Dr. Sunderland's opinions controlling weight with substantial evidence. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (noting that remand is appropriate where a reviewing court is "unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision") (internal quotation marks and citation omitted); Duncan v. Astrue, No. 09-CV-4462 (KAM), 2011 WL 1748549, at *18 (E.D.N.Y. May 6, 2011) (remanding where the ALJ did not explain his reasons for giving claimant's treating physician "reduced weight" beyond conclusory statements).

After describing each of Dr. Sunderland's opinions and stating that the opinions were "given little weight" because they were "generally inconsistent" with the Record, the ALJ inserted the following summary of the medical record:

> Specifically, the treatment notes indicated that the claimant's admissions to the Institute of Living had to do with situations where his substance abuse was having an effect on his mental condition (See Ex. 1F, 3F, 5F). While being housed in the Institute of Living and then incarcerated, the claimant's condition improved (Id.). Following the claimant's incarceration and starting in March of 2015, the claimant was consistently alert and oriented to person, place, and time, and was well groomed and had normal speech (See Ex. 13F, 16F). The medical records indicated that the claimant's thought process was intact, as was his judgment, and the claimant was not suicidal or homicidal (Id.). The claimant also reported improvement in his symptoms through the treatment process (Id.). The treatment notes from August of 2016 indicated that the claimant's largest barrier to treatment was a history of non-compliance (See Ex. 16F).

R. at 32, 33.

In the above summary, the ALJ mentioned parts of the Record that he appears to have viewed as unfavorable to White and elided evidence that supported Dr. Sunderland's findings. For example, although the ALJ wrote that Dr. Sunderland's second opinion was inconsistent with the "treatment nots [sic]," he made no mention of the specific treatment notes underlying Dr. Sunderland's findings that White would have difficulty performing certain tasks critical to employability. On April 20, 2015, Dr. Sunderland observed that, although White had been referred to a "grief/loss group" to help process the loss of his sister, grandmothers, and cousins, he did not attend because he was "not comfortable with groups right now." See R. at 617. On September 23, 2015, one week before submitting his second medical opinion, Dr. Sunderland noted that White was fearful of leaving the house and avoided social contact. See R. at 674. Dr. Sunderland wrote, "Trying to avoid people, places, things

that would lead him back to illegal activities, trying to avoid situations that could cause him to become violent." Id. The ALJ's cherry picking of the evidence led to an incomplete and slanted summary, which he then used as a benchmark against which to evaluate the treating source opinions. See Dowling v. Comm'r of Soc. Sec., No. 5:14-CV-0786 (GTS/ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) ("The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both.") As a result, the ALJ's conclusion that Dr. Sundlerland's opinions were unsupported because they conflicted with the summary paragraph was based on the false premise that the summary was an accurate reflection of White's mental condition.

The ALJ's summary also cited parts of the treatment notes containing general descriptions that, removed from their context, do not convey meaningful information about White's mental condition that could allow for a useful evaluation of Dr. Sunderland's opinion. For example, the ALJ noted that White met minimum standards of mental health—such as being alert and well groomed—while he lacked signs of extreme instability—such as suicidal or homicidal thoughts. See R. at 32–33. A claimant who is alert but not suicidal may fall within a wide range of mental conditions. The summary says nothing about any of Dr. Sunderland's specific findings, such as his determination in his September 2015 opinion that White had no ability to use appropriate coping skills or handle frustration appropriately, see R. at 603, and limited ability to persist in simple activities without interruption from psychological symptoms, see R. at 604. In addition, the ALJ relied on Dr. Sunderland's treatment note that White

had "improved" without explaining his past condition or his current state. <u>See</u> R. at 32–33. Detached from the treatment notes describing White's condition at the beginning and end of his course of treatment, the word "improved" does not indicate that Dr. Sunderland's findings regarding White's ability to perform certain tasks are unsupported.

Apart from stating that a particular medical opinion was "generally consistent" or "generally inconsistent" with the Record, the ALJ did not explain what part of the Record contradicted or failed to support the medical opinion. The ALJ introduced the summary paragraph at the end of his review of the medical evidence, <u>see</u> R. at 29, and then went on to repeat the summary paragraph verbatim seven times in his consideration of the opinion evidence without modifying it to draw connections between the medical evidence and any of the seven opinions, <u>see</u> R. at 30, 31, 32, 32–33, 33–34, 34, 34–35. However, a comparison of the summary of the record the ALJ recited in relation to each of the treating physician opinions and the treating physician opinions themselves reveals that the summary does not in fact contradict either opinion.

First, while substance abuse played a major role in White's admissions to the Institute of Living, White's admissions to inpatient care were consistent with longstanding mental illness. Upon his discharge after his first admission, he was diagnosed with "[b]ipolar disorder, most recent episode depressed with psychotic features" and "[a]ntisocial personality disorder" in addition to "[c]ocaine dependence" and "[a]lcohol dependence." <u>See</u> R. at 428. His discharge summary after his second admission noted "[s]chizoaffective disorder, bipolar type" and "[a]ntisocial personality

disorder" along with "[c]ocaine dependence" and "[a]lcohol dependence." See R. at 424.

Second, White's improvement while at the Institute of Living and while incarcerated from a state of being suicidal, paranoid, and abusing drugs provides little insight into his present ability to function. In addition, the ALJ does not explain the basis for his determination that White improved while in prison. To the contrary, White attempted to hang himself with a sweatshirt while incarcerated in 2012. See R. at 588. Moreover, White's mental state outside of prison would appear to be a better indication of his ability to work than his condition while incarcerated. The ALJ ignores information that would seem to complicate his narrative of improvement, including White's first appearance at Community Health Center ("CHC") on July 11, 2014, when Jennifer Osborn indicated that White suffered from severe depression, see R. at 639, and a consultative examination in which Dr. McLean observed White in tears and pulling out and eating his hair, see R. at 562.

Third, the ALJ's reference to psychologists' determination that White was aware of the people around him, the time of day, and his location says little about the extent of White's mental illness and the limitations that illness places on his ability to work. The same is true of White's presentation as well groomed and his ability to speak normally. In his treating source opinions, Dr. Sunderland himself opined that White's thought was within normal limits and that his judgment was intact, even as he concluded that White had difficulties performing functions such as responding to authority or completing tasks. See R. at 606–10, 601–05. The ALJ's reference to baseline standards of mental

health is not substantial evidence that Dr. Sunderland's opinions are inconsistent with the Record.

Fourth, White's improvement over the course of his treatment is also reflected in Dr. Sunderland's opinions themselves, which show that White took steps forward in his ability to perform certain tasks between the April 2015 opinion and the September 2015 opinion. It is not necessarily contradictory for a treating source opinion to reflect improvement yet still assess multiple functional limitations. Describing White's state simply as "improved" obscures the complicated composite of White's limitations and cannot serve as a basis to discount Dr. Sunderland's opinions.

Finally, the ALJ concluded that White's largest barrier to treatment was a history of non-compliance. The ALJ cites a treatment note stating, "[b]arriers to treatment history of non compliance." R. at 659. The ALJ does not explain how this single line in Dr. Sunderland's treatment notes undercuts Dr. Sunderland's treating source statements. Without an explanation for how this vague line in Dr. Sunderland's notes undercuts his findings regarding White's limitations, the court is unable to discern the reasons for the ALJ's decision. See Pratts, 94 F.3d at 39 (noting that remand is appropriate where a reviewing court is "unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision") (internal quotation marks and citation omitted).

Moreover, the ALJ erred by not analyzing White's purported noncompliance with treatment in accordance with the regulations. There are two Social Security Rulings that govern an ALJ's consideration of a claimant's failure to follow prescribed treatment. Under SSR 82—59, a claimant who has been found to be disabled may be denied

benefits if he has failed to follow prescribed treatment and that failure is not justified. Under SSR 16—3p, an ALJ may conclude that "the alleged intensity and persistence of an individual's symptoms" are "inconsistent with the overall evidence of record" if the claimant is not following prescribed treatment and there are no good reasons for this failure. Thus, whether an ALJ is applying SSR 82—59 after finding a claimant disabled, or applying SSR 16—3p in assessing the intensity of a claimant's symptoms before arriving at an RFC, an ALJ must consider the possible reasons a claimant has not adhered to treatment before weighing the claimant's noncompliance against his claim for benefits.

After declining to afford the treating source's opinions controlling weight, ALJ Bonsangue failed to analyze the factors he is required to consider under the Regulations on determining the appropriate amount of weight to give a non-controlling treating source opinion. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) (the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.") For example, the ALJ did not explain how the length of Dr. Sunderland's treating relationship with White bore on the weight he gave his report. See 20 C.F.R. § 404.1527(c) (listing factors including (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion). On remand, should the ALJ determine that Dr. Sunderland's opinions are not entitled to controlling weight, he is obligated to apply the factors and

provide "good reasons" for the value he assigns the opinions. <u>See</u> 20 C.F.R. § 404.1527.

The court concludes that the ALJ erred by failing to properly apply the treating physician's rule. On remand, the ALJ should analyze whether to afford the treating physician's opinions controlling weight and, if not entitled to controlling weight, assess the amount of weight they merit. If the ALJ is uncertain of the basis for the treating source opinions, he should recontact Dr. Sunderland for clarification. <u>See</u> 20 C.F.R. § 404.1520b(b)(2)(i).

      B.    <u>Substantial Evidence</u>

White argues that the ALJ's Decision is not supported by substantial evidence because he "cherry picked" parts of the consultative examiners' opinions that supported his RFC determination and ignored those that detracted from it. <u>See</u> Pl.'s Mem. at 6–10. White also argues that the ALJ's decision to give "great weight" to the non-examining state agency psychologists' opinions was not supported by substantial evidence because the psychologists—who reviewed the Record a year and a half before the hearing—did not have all of the evidence in front of them at the time of their reports. <u>See</u> <u>id.</u> at 3–6. In addition, White argues, the ALJ impermissibly exercised medical judgment by picking among Global Assessment of Functioning ("GAF") scores, <u>see</u> <u>id.</u> at 17–20, and the ALJ's RFC was flawed because it did not take all of the evidence into account, <u>see</u> <u>id.</u> at 20–24. The Commissioner argues that the ALJ properly relied on portions of the medical opinions that were consistent with the Record and rejected those that were not. <u>See</u> Def.'s Mem. at 7–13.

The court concludes that the RFC is not supported by substantial evidence because the ALJ "cherry picked" portions of the consultative examiners' opinions and did not provide sufficient explanations for why he afforded weight to certain parts of the opinions and not others in forming White's RFC. As discussed above, the ALJ assessed each medical opinion against a summary paragraph he prepared of the medical evidence. See R. at 29, 30, 31, 32, 32–33, 33–34, 34, 34–35. Apart from reciting the same paragraph after his description of each opinion, the ALJ offered scant analysis of the opinions. Repetition of a general summary of the evidence without any analysis of the relationship between the Record and the content of a given medical opinion does not constitute substantial evidence in support of the ALJ's findings. See Monroe v. Comm'r of Soc. Sec., 5:15-CV-1235 (GTS/WBC), 2016 WL 7971330, at *8 (N.D.N.Y. Dec. 29, 2016) ("[A] terse analysis of an opinion, especially one upon which the ALJ primarily based his RFC determination, prevents meaningful review.") This is especially true when, as here, the summary is selective and incomplete. In effect, the ALJ provided no explanation for his findings beyond characterizing medical opinions as "generally consistent" or "generally inconsistent" with the Record.

The ALJ gave weight to statements within the consultative examiners' opinions that were consistent with his view of the evidence and discounted anything that was inconsistent with his view. For example, the ALJ gave "partial weight" to Dr. Hart's 3/22/2011 report, which was prepared for the purpose of a competency evaluation. See R. at 31. The ALJ credited the portion of Dr. Hart's report finding that White was competent to stand trial, even though the question of competency to stand trial is an entirely different inquiry than the ability to work. See id. Meanwhile, the ALJ ignored

parts of Dr. Hart's opinion that were consistent with Dr. Sunderland's findings regarding White's capacity to work, such as Dr. Hart's recommendation that White pursue stress and anger management groups.  See R. at 463.

The ALJ's cherry picking of consultative examiner opinions is also apparent in the "partial weight" he afforded the opinions of Dr. McLean and Dr. Burns.  See R. at 31, 33.  Dr. McLean opined that White "appeared to be experiencing acute symptoms of psychosis."  R. at 564.  White reported hallucinations, showed evidence of paranoia, had significantly impaired remote memory, exhibited poor concentration and attention, and was depressed.  See R. at 563–64.  Despite declining to credit Dr. McLean's opinion generally, the ALJ gave weight to the only portion of her opinion that was unfavorable to White's disability claim: "could likely be employed if receiving the appropriate mental health care."  See R. at 564.  ALJ Bonsangue did not provide any explanation beyond the general summary of the evidence he repeated verbatim seven times in his Decision for why he gave that statement weight.  Similarly, the ALJ gave weight to the portion of Dr. Burns's opinion in which she said that White "will likely be able to understand and follow simple instructions and directions with light prompting" and "may struggle to learn new tasks, perform complex tasks, manage his stress levels, maintain a schedule, and relate well to others," which was consistent with the nonexertional limitations in the RFC the ALJ formulated.  See R. at 599–600; 33. However, the ALJ discredited the portion of the opinion stating that White had "psychiatric and cognitive problems that may often interfere with [his] ability to function on a daily basis" and that he had a "fair to poor prognosis."  R. at 599–600; 34.

White also argues that the ALJ erred by according opinions more or less weight based on whether the Global Assessment of Functioning ("GAF") scores favored the ALJ's view of the evidence.[6]  See Pl.'s Mem. at 18.  Although he gave Dr. Sunderland's opinions little weight, the ALJ relied on the GAF scores Dr Sunderland assessed in his treatment notes from July 20, 2015 and October 28, 2015.[7]  See R. at 28, 35.  However, following the American Psychiatric Association's removal of GAF scores in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), the Social Security Administration has further constrained the use of GAF scores, see S.S.A. AM-13066, July 22, 2013 (stating that the SSA considers the GAF score a medical opinion but noting that "the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise" and that "[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation.") Courts in the Second Circuit have criticized ALJs for relying solely on a GAF score to reject a treating opinion.  See Wiggins v. Colvin, No. 3:13CV1181 (MPS), 2015 WL 5050144, at *4 (D. Conn. Aug. 25, 2015) (collecting cases).

---

[6] According to the DSM IV, the GAF is a rating of overall psychological functioning on a scale of 0 to 100.  A rating of 41–50 indicates serious symptoms (such as suicidal ideation, several obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (such as having no friends or being unable to keep a job).  A rating of 51–60 means moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (such as having few friends or conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

[7] The ALJ attributed the GAF scores to Dr. Stebinger and Dr. Cintron, but they were assessed by Dr. Sunderland.  See R. at 676–77, 672.  Dr. Sunderland treated White and memorialized his session first under the supervision of Dr. Stebinger and then under the supervision of Dr. Cintron.  See id.

Because the ALJ's Decision is being remanded on other grounds, the court does not reach the question of whether the ALJ committed legal error by using GAF scores without reference to the treatment notes in which they were recorded or the expertise of the rater, in this case Dr. Sunderland. However, on remand, if the ALJ relies on GAF scores, he should view them in the context of the evidence as a whole. <u>See</u> <u>Alsheikmohammed v. Colvin</u>, No. 6:14-cv-461 (GTS), 2015 WL 4041736, at *8–9 (N.D.N.Y. July 1, 2015) ("Although a GAF score is opinion evidence, it should be considered in the context of the record and not as a stand-alone indicator of Plaintiff's ability (or inability) to function.") Conclusory statements such as "somewhat consistent," "generally consistent," and "inconsistent" with the medical evidence are insufficient to indicate to the court that the ALJ used the GAF scores in the context of the other evidence as opposed to mechanically according the numbers weight. <u>See</u> <u>Mainella v.</u> <u>Colvin</u>, No. 13-CV-2453-JG, 2014 WL 183957, at *5 (S.D.N.Y. Jan. 14, 2014) ("The ALJ did not simply accord the numbers weight; he looked to the underlying bases for those numbers and analyzed them in the context of the evidence as a whole.")

Finally, White argues that the non-examining state agency psychologists' opinions could not supply substantial evidence in support of the ALJ's Decision because the non-examining psychologists did not review all of the evidence in the Record. <u>See</u> Pl.'s Mem. at 4. White argues that, since the non-examining state agency opinions were the only opinions to which the ALJ afforded "great weight," the RFC is not supported by substantial evidence. <u>See</u> <u>id.</u> However, the regulations do not require nonexamining sources to be familiar with all of the medical evidence in the Record in order to be assigned weight. <u>See</u> 20 C.F.R. § 404.1527(c)(3). Rather, the regulations

state that the degree to which a physician considers all of the pertinent evidence in a claim goes to the supportability and weight of his opinion.  See id.  The inability of the state agency experts to take into account the evidence that came after their review of the Record may diminish the persuasiveness of their opinions, but it does not mean that their opinions could not form a basis for the ALJ's Decision.  Indeed, Dr. Sunderland's treating source opinions were prepared around the same time as the state agency psychologists' reports.  See R. at 595, 605.

Moreover, although non-examining doctors are entitled to little weight, particularly in the context of a psychiatric disability claim, see Velazquez v. Barnhart, 518 F. Supp. 2d, 520, 524 (W.D.N.Y. 2007), an ALJ's decision can be supported by substantial evidence even without the benefit of an opinion assigned significant weight.  See Monroe v. Comm'r of Social Sec., 676 Fed. App'x 5, 8–9 (2d Cir. 2017) ("Because the ALJ reached her RFC determination based on Dr. Wolkoff's contemporaneous treatment notes—while at the same time rejecting his post hoc medical opinion ostensibly based on the observations memorialized in those notes—that determination was adequately supported by more than a mere scintilla of evidence."); Tankisi v. Comm'r of Soc. Sec., 521 Fed. App'x 29, 34 (2d Cir. 2013) (extensive medical record was sufficient to support ALJ's RFC determination despite lack of formal opinion evidence from treating physician).  The court therefore disagrees with White's contention that, purely by virtue of not having properly assigned any medical opinion great weight, the ALJ's opinion could not be supported by substantial evidence.

C.    Disposition

White requests reversal and an order for payment of benefits.  See Pl.'s Mem. at 24.  Section 405(g) of title 42 of the United States Code provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner "with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (2016); U.S.C. § 1383(c)(3) (2016) (indicating that review under section 1383(c) is subject to the same review as provided in section 405(g) of title 42).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development.  On the other hand, we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980) (citations omitted).  "Remand is particularly appropriate where [the court] is unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision."  Pratts, 94 F.3d at 39 (internal citations and quotation marks omitted). Because the ALJ misapplied the treating physician rule and prevented meaningful judicial review by failing to state the reasons for his conclusions, remand is appropriate.

VI.    **CONCLUSION**

For the reasons stated above, the Motion for Order Reversing the Commissioner's Decision is **GRANTED**, and the Motion for Order Affirming the Decision of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this Ruling.  The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 11th day of June, 2018.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge